Okay, with the lawyer's approach, introduce yourself. Your Honor, my name is Chris Gerke. I'm with the State Appellate Defender here on behalf of Jamie Quezada. Matthew Connors on behalf of the people of the State of Illinois. I understand, Mr. Appellant, that you have to reserve some time. Yes. Okay. Your Honor, may it please the Court, I'd like to focus primarily on the first issue in this case and rest of my brief for the remainder of the issues, but of course if the Court would like to discuss any of them, I'd be more than happy to. Your Honor, the first issue in this case pertains to the non-initial aggressor jury instruction. The instruction states that a person who has not initially provoked the use of force against themselves has no duty to escape danger before responding with force against the aggressor. Now, the standard for jury instruction error is only very slight or some evidence. In this case, I think it's very clear that there's more than enough evidence to establish that. I think there's more than enough evidence here to establish that, to meet that standard of some or very slight evidence. It's undisputed that neither my client nor any of his friends did anything to provoke Calderon into pulling over his car. In fact, Gamez, who was driving Calderon, actually testified that they didn't do anything. The facts show that Gamez and Calderon drove out of their way into rival gang territory, of which my client was a member. Spotted Cazada from a half block away, Calderon told Gamez to pull over the car next to where my client was standing. Gamez did so. They both jumped out of the car. Mr. Calderon came at my client in what was described as a threatening, aggressive manner, with his hands in or near his pockets or his waistband, as though he were armed, shouting death threats. I think that's more than enough to establish the very slight or some evidence standard for jury instruction error. When Calderon approached him, did he have a weapon? It turned out that he did not have a weapon, although I'd like to point out to the court that he did have his hands in or near his pockets or his waistband, and he was shouting death threats. He was shouting death threats. He was shouting SDK or SD killer, which my client had said were death threats. Now, this is a particularly serious error, Your Honor, especially because the nature of the evidence is very close on the issue of whether or not Mr. Cazada acted reasonably in response. As I stated before, there's significant evidence that Calderon was the aggressor. They acted in an extremely threatening manner, especially considering, Your Honors, that Mr. Calderon was a full six inches tall or 65 pounds heavier than my client. My client was only 5 foot 2 or 5 foot 3 and 110 pounds. I think this is exactly the kind of closely balanced case where the failure to give this instruction is particularly prejudicial. The non-initial jury instruction, if the jury had thought that Mr. Cazada should have not acted, shouldn't have responded with force, if they thought he should have backed off, he should have waited, he should have kept walking or tried to avoid Mr. Calderon, then they were much more likely to find that his response would be unreasonable. However, under Illinois law, as described in the non-initial jury instruction, he had the right to stand his ground. He had the right to respond with force. And had the jury known that, they would be much more likely to find this use of force. Doesn't the non-initial aggressor instruction presume that force was exercised against your client? No, Your Honors. Well, doesn't it say a person who has not initially provoked the use of force against themself? So what use of force are we talking about? We're talking about a perceived use of force against my client. It doesn't say the perceived use of force. It says a person who has not initially provoked the use of force against himself has no duty to attempt to escape. So doesn't that instruction presume that force has been used against your client before he has to decide whether or not he's going to retreat? I don't think so, Your Honor. I think that, especially considering the fact that if you look at the committee notes of the non-initial jury instruction, it's made to be given with the self-defense instruction. And the self-defense instruction reads that if you have a reasonable belief that you create bodily harm or a reasonable belief that your life is in danger, you can respond with force. And here, I don't think you can divorce sort of the... But that instruction was given. That instruction was given. So why doesn't that just take care of it? Because, Your Honors, it doesn't take care of it because the law states that if a non-initial... has no duty to escape from danger when he is threatened by an aggressor. Now, here, I think that the inquiry here isn't necessarily whether force is used. The inquiry here is whether Calderon was the aggressor. And I think under Illinois law, it's clear that he was, especially considering that this Court has found in 2010 in People v. Dunlop, which cites many case law going back a ways, is that even the mere utterance of words makes someone an initial aggressor. Now, here, we have much more than words. We have threatening conduct. We have, in addition to life... In addition to death threats, we have extremely threatening conduct where, as I stated, Mr. Calderon drove... Mr. Gammons initially testified that he was really driving Calderon to school, which was north of Calderon's home. The actual testimony and the actual facts show that they drove south into rival gang territory, spotted my client, pulled over next to him, jumped out of the car, and acted in an extremely threatening manner. Now, I think that, as I stated, I think that because the evidence is so close on the issue of whether my client acted reasonably in that scenario, I think that this... I think that the jury instruction error here is particularly prejudicial, as I stated. If the jurors had thought that he should have backed off, then it's more likely that they believe that his actions were unreasonable. If they had known he had the right to stand his ground, when he's threatened by an initial aggressor, which includes mere utterance of words, then his actions would be perceived as more reasonable. Now... What were the facts in People v. Dunlap? In People v. Dunlap, the person was found... I don't have all the facts memorized, Your Honors, but in People v. Dunlap, the person was found to be an initial aggressor there where he was banging on a window outside somebody's home and yelling at them, and eventually an altercation ensued. And he ended up, I think, beating a woman with a bat. But that was not a non-initial aggressor case, but that was just an initial aggressor case about that instruction. But I think that it shows what an initial aggressor is. And here, as I stated, not only did Mr. Calderon threaten, he acted extremely threatening. And this is on top of the fact, Your Honors, that he had previously threatened my client in the past, making death threats to him in the past, which my client said made him fear for his life, such to the point that he actually joined a gang to protect himself, for protection. As I said, Your Honors, because the non-initial aggressor instruction goes directly to the very closely balanced issue of whether my client acted reasonably, I think that the error here warrants a reversal in remand. Now, unless there are any more further questions about this issue. How many shots? There were four shots, Your Honors, four quick shots. All the testimony indicated that this entire incident happened very quickly. Now, if there are no further questions on this issue, unless the Court would like me to discuss any other issues, I'll reserve the rest of my time for rebuttal. Thank you. May it please the Court. The Circuit Court properly denied defendant's request for the non-initial aggressor instruction. At the outset, this issue needs to be viewed within the guise of forfeiture due to defendant's counsel's failure to preserve this issue by failing to file it and raise it in his motion for new trial. So it is through that lens with which the argument must be addressed. But turning to the substance of the argument, I believe Justice Palmer hit the nail on the head when he asked, doesn't the initial aggressor instruction contemplate the use of force? And in this case, the defendant can point to nothing more than, quote, aggressive walking or the multitude of witnesses who said, we thought he was going to do something. What that something is isn't borne out by the record. We have defendant's own testimony in this case where he said he observed the victim get out of the car and within seconds fired off three to four shots. Now, defendant testified that, well, he was a rival gang member in my part of the town, in rival gang territory. This clearly isn't aggressive behavior. There's no boundaries which keep people out of different parts of the city by virtue of gang association. The notion that there were death threats made, saint-disciple killer, two-six killer, all of this, the notion that that in itself, a general gang slogan, is in fact a death threat directed at one person, isn't borne out by the record. One of the people defendant was with that morning testified, we saw two-sixes driving around the neighborhood. And based upon that information, defendant went to a fellow saint-disciples gang member and chose to arm himself. This is an occasion where defendant was merely standing on a street corner and happened to have a gun. He sought out a weapon that morning. The circuit court properly picked up on this and in denying defendant's request for the instruction, he discussed the lack of mutual combat, the lack of aggression, the lack of anything which can be construed as the use of force against the defendant. That is essential. The Dunlap case is referred to by the defendant doesn't actually speak to the non-initial aggressor. However, in People v. Alexander, cited in People's Brief in 408 Illap III, 1003, the reviewing court said that under the evidence presented in this case, the defendant's claim of self-defense hinged upon the reasonableness of the defendant's use of force, not on whether he had a duty to escape before using that force. That logic is equally applicable here. There is no question that the jury would have thought, well, had the defendant run away, maybe we wouldn't have to worry about this. That wasn't even the thrust of the examinations. All of the testimony that was listed all drove to one point. Defendant put forth his self-defense claim and said, I was afraid. I was so afraid that I reached into a pocket, pulled out a gun, and shot three to four times before the victim got within four feet of him. The disparity in size, the disparity in weight is immaterial where defendant had the great equalizer, which was a loaded weapon, which prevented the victim from getting any closer to him. And based upon those facts, it cannot be said that the circuit court abused its discretion. Some of the older case law before the current form of this instruction talks about the non-initial aggressor in language that says, a defendant who was first assaulted by another. Yes. So how would you respond to the argument that I expect from the appellant that he was assaulted by another? The Hughes-Miller case, which precipitated the issuance of this instruction, must be noted that the IPI chose not to use that language. You are discussing cases from a much different time where the use of the term assault had different connotations. In this case, the IPI specifically contemplates the use of force. And again, it says, a person who has not provoked the use of force against himself. There is no reference to a person who has been assaulted, a person who has been approached in a threatening manner, a person who walks up to you on the street and may or may not have said, Satan, disciple's killer. None of those fall within the parameters of this where it says, the use of force against himself. And that's where this case turns. Because there was no use of force against the defendant, because he cannot point to anything in the record to support his use of force, which is why the jury rejected his claim of self-defense. The jury did get the benefit of an instruction on self-defense. The jury came back with a second-degree murder conviction, demonstrating an unreasonable use of force. Defendant's argument would ask this court to assume that the only thing that was unreasonable about shooting an unarmed man from four to six feet a few seconds after seeing him exit a car was that the defendant failed to walk away, not that he showed an unarmed victim. That's clearly not what the facts of this case would support and not what the jury would have concluded. Perhaps you could remind us, was this issue mentioned in the arguments in front of the jury? Was it ever claimed by the state's attorney that the defendant should have run away, that he'd get other alternatives, things like that? The sole recollection that I have of the closing arguments made by the prosecutor address the use of force in the self-defense context. We do have a number of claims, I'm guessing, mortal combat, self-defense used to protect your life, the defendant feeling that he was afraid. Whether or not there is a sentence somewhere in there discussing the defendant's obligation to flee, I do not recall. I'd be happy to peruse the record to present that, but that was clearly not. That's probably a better question to ask the appellants anyway. Yes. But there are no further questions. The people submit that for all those reasons, those stated in the people's brief, this Court should affirm the defendant's conviction. Thank you very much. So tell me, was it ever argued by the state? Your Honors, it was certainly implied by the state. As my opposing counsel stated, the defense counsel, or rather the prosecutor, argued that basically that his actions were unreasonable, that Mike Klein's actions were unreasonable because there wasn't mutual combat. As I explained before, to suggest that his actions were unreasonable because there wasn't mutual combat suggests that Mike Klein did not have the right to respond when he was threatened by an aggressor. And while he didn't specifically say he should have run away, they did suggest that his use of force was unreasonable because there wasn't mutual combat in this case. And as I explained, there's an initial aggressor during instruction and a non-initial aggressor during instruction. And the non-initial aggressor during instruction is concerned with whether the person who uses a force is the one who's the initial aggressor. And here, for the same reasons I stated before, I think it's clear that Mr. Calderon was the initial aggressor in this case. And even under the plein air standard, as I explained, the issue here is extremely closely balanced, especially considering the fact that the jury found second degree, acquitted him of first degree murder here. It's clear that the jury, that the issue of whether Mr. Quezada's conduct was reasonable is a very closely balanced issue. And as such, assuming that the evidence is closely balanced under a plein air analysis, and especially considering, for the reasons I discussed, that the non-initial aggressor instruction goes directly to the issue of whether his conduct was reasonable, I think that under a plein air analysis that we would still succeed. I'd also like to just address a few factual things that the prosecutor said. One is that he said the testimony doesn't show that there are any death threats. First of all, saying SDK, SD killer, to SD is a death threat. And second of all, Mr. Quezada specifically testified that saying that is a threat on someone's life. As for the fact that he obtained a gun, there were two 6th members driving around, and they were saying SDK and SD killer to him before he went to obtain a weapon. It's clear from the testimony that he did that because he felt like his life was being threatened and he needed to protect himself. But isn't that stuff that they always say? I mean, every time they go by each other they say that. Is that a death threat every time they say that? Or is that just the nature of being in a gang? Your Honor, I can only go with what's in the record, and Mr. Quezada specifically testified that saying that is a death threat. And regardless, we're not concerned with the people who are driving around. We're concerned primarily with the person that pulled up next to my client, jumped out of a car, approached him in an aggressive manner, saying death threat. The unarmed. Unarmed, but with his hands in or near his pockets or in his waistband, appearing as though he were armed. And while the prosecutor says this is just merely aggressive walking, I think I explained for the multiple reasons why. It wasn't just the fact that he was walking that shows the initial aggressor. It shows the fact that he drove out, including the fact that he had previously threatened him in the past, spotted him on the street, pulled over at the curb, and then came out of the car at him, I think is also relevant. And as far as people versus Alexander, which he said is a third district case, that case didn't really conduct any specific closely balanced error analysis. And I'd also like to point out the facts here are much closer than in that case. The facts in Anderson, the defendant thought that the victim had raped his friend. He confronted the victim at his house. A fight ensued, and then someone saw him stabbing the victim away from the house in the alley. Here, as I say, the evidence is much closer than that. In addition to the extent that Anderson might suggest that the reasonableness of the use of force has nothing to do with the non-initial aggressor instruction here, I think that that's mistaken and that's wrong for the same reasons I argued before. And therefore, Your Honors, because the evidence in this case is extremely closely balanced on the issue of whether Cazada's use of force is reasonable, and because the non-initial aggressor instruction goes directly to that issue, I think that even in a plein air analysis, reverse and remand is required. Thank you, Your Honors. You know, I wanted to ask you a question. You know, in traffic situations every day in Chicago, people get mad at each other when they drive cars. Sometimes somebody gets out of a car and he walks over to a car and he says to the driver, you know, I ought to kill you. So does that mean that every time somebody says that, you should shoot him? Of course not, Your Honor. I think that the only issue in this case is whether there was error to give the non-initial aggressor instruction. And here, especially considering the facts preceding what happened when he pulled over the car and the history of threats against my client, I think that taking all that into the context of the case, I think that shows that Mr. Calderon was the aggressor. I'm certainly not excusing that kind of behavior. Well, I mean, you know, the same thing applies, you know, in gangs. Sometimes people get out of cars in gangs and scream and yell at other people. They don't always kill them, do they? No, they don't, Your Honor. The only issue in this case is whether it was error to give the jury instruction here. So I understand. So that instruction should be given in every case? That instruction should be given in cases where there's some evidence to support the fact that the shooter or that the person who responded with force is not the initial aggressor. It should be for the jury to decide, with the knowledge of that fact, whether or not the person's conduct was reasonable in the context of that law. So, but the other side of that is that the other person is the initial aggressor, when you're insisting on the instruction. So in the scenario that was just painted for you out on the highway, when a person's in a road rage situation, when a person gets out of the car and walks up and says, hey, you know, you cut me off, I should kill you, boom, there's the non-initial aggressor instruction. Because the guy in the car takes out a gun and shoots the guy. Well, I think, Your Honor, the entire context of the situation should be taken into account. In a road rage situation, I don't think it's, I think a jury would find that to be less reasonable, that that someone was really an initial aggressor. I don't think that, while the court has said that, you know, the mere utterance of words alone can be, can make someone an initial aggressor, I think you have to look at what words are being said and the context of being said. I think I should kill you, saying something like I should kill you, I don't know if that's really a true threat on somebody's life, as it was here. Thank you, Your Honor. Thank you very much. You gave us a very interesting case and very good arguments, and we'll take the case under advisement.